# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### June 24, 2014 Session

## STATE OF TENNESSEE v. JERRY KIRKPATRICK

**Appeal from the Criminal Court for Knox County**
**No. 97434      Steven Sword, Judge**

---

**No. E2013-01917-CCA-R3-CD - Filed August 22, 2014**

---

The Defendant, Jerry Kirkpatrick, was indicted for burglary and theft of property valued at $1,000 or more but less than $10,000, both Class D felonies. See Tenn. Code Ann. §§ 39-14-103, -105, -402. Following a jury trial, the Defendant was acquitted of the burglary charge and convicted of the theft charge. The trial court sentenced the Defendant as a Range II, multiple offender to seven years. The trial court ordered the Defendant's sentence to run consecutively to his sentence for a prior conviction. In this appeal as of right, the Defendant contends (1) that the evidence was insufficient to sustain his conviction because the testimony of his accomplice was not sufficiently corroborated and (2) that the trial court erred in ordering his sentence to be served consecutively to a prior sentence. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ROBERT W. WEDEMEYER, J., joined.

Keith Lowe, Knoxville, Tennessee (at trial); and Robert L. Vogel, Knoxville, Tennessee (on appeal), for the appellant, Jerry Kirkpatrick.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Kenneth F. Irvine, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

Arthur Harvey Bell testified at trial that he was the president of U.S. Golf and that the company had six stores in Tennessee. Mr. Bell testified that in the early morning of November 25, 2008, U.S. Golf's Knoxville store was burgled. According to Mr. Bell, the burglars cut the telephone line and "tore [the alarm system] to pieces." Mr. Bell testified that the building was "metal" and that the burglars "pried open the metal to get through the back of the building." Mr. Bell also testified that the burglars tracked mud and straw throughout the store.

According to Mr. Bell, the burglars caused a lot of damage to the inside of the store and took "quite a bit of property." Mr. Bell testified that the burglars took "[m]ostly [golf] clubs." They also took the cash register and "literally ripped apart" a vending machine to access the money stored inside. Mr. Bell further testified that the merchandise counters "were completely trashed" and that money was taken "from different places" throughout the store. Mr. Bell estimated that the value of the items taken and the damage to his property was "over $50,000."

Mr. Bell testified that the clubs that were taken were expensive and some of them had serial numbers on them. Mr. Bell testified that he was only able to recover two of the stolen clubs. According to Mr. Bell, a week after the burglary, a man named William Lewis brought Mr. Bell a golf club that had been purchased on eBay. Mr. Bell testified that the serial number on the golf club matched the serial number for one of the stolen clubs. Mr. Bell admitted on cross-examination that the club was not shipped to Mr. Lewis by the Defendant and that he did not know the Defendant.

Paula K. Gonzalez testified that she sold the golf club to Mr. Lewis on eBay. Ms. Gonzalez claimed that she did not know that the golf club was stolen when she sold it. Ms. Gonzalez testified that her boyfriend at the time, Ronald Kent Mabry, had purchased some golf clubs from a man named Leonard. According to Ms. Gonzalez, Mr. Mabry asked her to sell the clubs he did not want to keep on eBay.

Mr. Mabry testified that in November 2008, his friend Leonard Freeman approached him about buying some golf clubs. Mr. Mabry testified that he was interested in Mr. Freeman's offer because Mr. Freeman was asking $2,000 for golf equipment he believed to be worth approximately $6,000. According to Mr. Mabry, Mr. Freeman assured him that the clubs were not stolen and that Mr. Freeman was able to get the clubs discounted in Atlanta.

Mr. Mabry testified that he met Mr. Freeman at a local drug store and that they drove together to a house to look at the golf clubs. Mr. Mabry testified that he believed Mr. Freeman was staying at the house and that Mr. Freeman had previously taken him to the same

house. According to Mr. Mabry, when he got to the house, he saw the Defendant. However, Mr. Mabry testified that he did not speak to the Defendant that day.

Mr. Mabry testified that Mr. Freeman took him to a room upstairs to look at the golf clubs. Mr. Mabry also testified that the room had a "bolt lock" on the door. According to Mr. Mabry, the golf clubs appeared to be "brand new." A few days later, Mr. Freeman brought the clubs to Mr. Mabry's apartment, and Mr. Mabry paid cash for them. Mr. Mabry then asked Ms. Gonzalez to sell the clubs he did not want on eBay. Mr. Mabry testified that he later showed the police the house where Mr. Freeman had taken him to look at the golf clubs.

Daniel Bryan Phelps testified that he "was in on" the November 25, 2008 burglary of the U.S. Golf store. Mr. Phelps testified that the Defendant and the Defendant's brother, Chris Kirkpatrick, both participated in the burglary with him. Mr. Phelps testified that it was the Defendant and the Defendant's brother's idea to burgle the store and that they "planned [it] out a couple of days ahead."

Mr. Phelps testified that on the night of the burglary, he drove the Defendant and the Defendant's brother to U.S. Golf. According to Mr. Phelps, he left the Defendant on the side of the road so the "car wouldn't be on camera," and the Defendant went behind the building to "check the alarm system." Mr. Phelps testified that he parked the car "up the road" and that he and the Defendant's brother walked to U.S. Golf "through the woods back behind the business." According to Mr. Phelps, the Defendant cut the alarm system and the phone line to "kill the [alarm] system."

Mr. Phelps testified that to enter the building, the men "took the screws out on the siding [of the building], pulled the metal back, and [] kicked the Sheetrock in." According to Mr. Phelps, all three of them went inside the building and started taking the "most valuable things [they] could get." Mr. Phelps testified that he took "some money" and "some golf clubs and golf bags" out of the store. Mr. Phelps further testified that they piled up the items outside the store and that the Defendant left to bring the car back. The men loaded "seven to ten [golf] bags" full of golf clubs into the car.

Mr. Phelps testified that the Defendant drove them from U.S. Golf to the Defendant's house on Coker Avenue. According to Mr. Phelps, they took the items into the Defendant's house and divided them amongst themselves. Mr. Phelps testified that they attempted to sell the golf clubs "to anybody [they] could." Mr. Phelps also testified that the Defendant enlisted Mr. Freeman's help in selling his share of the stolen items. Mr. Phelps admitted that he had previously given Mr. Freeman stolen property to sell. Mr. Phelps testified that Mr. Freeman did not live with the Defendant but that the Defendant's brother did.

Mr. Phelps admitted that he had approximately twenty-five prior convictions for burglary, theft, and vandalism and that all of his convictions were the result of plea agreements with the State. Mr. Phelps also admitted that he had been charged with other burglaries and thefts, but those charges had been dismissed as part of his plea agreements. Mr. Phelps testified that he was currently on probation and enrolled in a drug court program but claimed that he had no deal with the State to testify in this case.

On cross-examination, Mr. Phelps admitted that he was caught at the scene of a burglary and only agreed to speak with the police in hopes of obtaining a plea deal. Mr. Phelps also admitted that he originally told the police that he was not involved in the burglary of U.S. Golf and that he had seen some golf clubs in the Defendant's house, but he had no idea where they had come from.

Lieutenant Steve Webb of the Knox County Sheriff's Office testified that he investigated the burglary of U.S. Golf. Lt. Webb testified that Mr. Mabry was able to take him to the house where he viewed the golf clubs. According to Lt. Webb, the house was on Corker Avenue, and the Defendant and the Defendant's brother lived there. Lt. Webb also testified Mr. Mabry told him that when he looked at the golf clubs, Mr. Freeman's friend, Jerry, was there.

Lt. Webb testified that he was involved in Mr. Phelps's initial arrest and that "it was pretty immediate" that he admitted his involvement in the U.S. Golf burglary. Lt. Webb further testified that Mr. Phelps provided him with a statement that matched the facts of the burglary. Lt. Webb admitted that a search of the Defendant's house did not reveal any of the stolen items and that the Defendant was never found in possession of any of the stolen items.

Based upon the foregoing evidence, the jury acquitted the Defendant of the burglary charge and convicted him of theft of property valued at $1,000 or more but less than $10,000. On December 6, 2012, the trial court held a sentencing hearing on this matter. At the hearing, it was established that between 1987 and 1993 the Defendant had been convicted of felony escape, burglary, attempted burglary, and "petit larceny." It was also established that the Defendant had repeatedly been placed on probation and absconded from probation until his sentences expired in 2000. The Defendant had also recently been convicted of burglary and theft of property valued at $1,000 or more but less than $10,000 in another related case.

Based upon his prior convictions, the trial court determined that the Defendant was a Range II, multiple offender. In setting the length of the Defendant's sentence, the trial court placed a great amount of weight on the Defendant's "very lengthy criminal history." The trial court also found that the Defendant was a leader in the commission of the offense.

-4-

The trial court gave some weight to the fact that the Defendant had "lived relatively crime free for nine years," which broke "up a little bit the lifetime of crime" the Defendant had engaged in. The trial court sentenced the Defendant to seven years for his conviction. The trial court ordered the Defendant to serve his sentence consecutively to a prior sentence, finding that the Defendant was a professional criminal who had knowingly devoted his life to criminal acts as a major source of livelihood and because the Defendant's record of criminal activity was extensive.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his conviction because Mr. Phelps's testimony was not sufficiently corroborated. The Defendant argues that there was no other evidence to connect him with the stolen golf clubs. The Defendant further argues that there was no "documentary evidence" to support Lt. Webb's testimony that he lived at the house where Mr. Freeman showed Mr. Mabry the golf clubs. The State responds that Mr. Phelps's testimony was sufficiently corroborated by the evidence at trial.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . [and] [i]f the jury is convinced beyond a reasonable doubt, we can require no more." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Theft of property occurs when a person "knowingly obtains or exercises control over the property without the owner's effective consent" with the intent "to deprive the owner of [the] property." Tenn. Code Ann. § 39-14-103(a). A person acts knowingly "with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-106(a)(20). A person acts knowingly "with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id.

It is well-settled that in Tennessee, "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). An accomplice is one "who knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime." State v. Ballinger, 93 S.W.3d 881, 887 (Tenn. Crim. App. 2001). Whether there is sufficient corroboration is a determination for the jury. Shaw, 37 S.W.3d at 903.

Our supreme court has described what is required to establish sufficient corroboration as follows:

[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only

-6-

that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

Shaw, 37 S.W.3d at 903 (quoting State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)). The corroborative evidence need not be "overwhelming." Id. In fact, "[o]nly slight circumstances are required to corroborate an accomplice's testimony." State v. Griffis, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997).

Mr. Phelps testified at trial that the Defendant participated in the burglary of U.S. Golf and that the stolen items were taken back to the Defendant's home on Corker Avenue and divided between Mr. Phelps, the Defendant, and the Defendant's brother. Mr. Phelps also testified that Mr. Freeman assisted the Defendant in selling some of the golf clubs. Mr. Mabry testified at trial that Mr. Freeman approached him about buying some golf clubs. According to Mr. Mabry, Mr. Freeman took him to a house to view the golf clubs, and the Defendant was in the house when they arrived. Later, Mr. Freeman brought the clubs to Mr. Mabry's apartment, and Mr. Mabry paid cash for them.

One of the golf clubs Mr. Mabry purchased from Mr. Freeman was sold on eBay by Ms. Gonzalez. The serial number of the club matched the serial number of one of the clubs stolen from U.S. Golf. Lt. Webb testified that Mr. Mabry was able to show him the house Mr. Freeman had taken him to, that it was on Corker Avenue, and that the Defendant and the Defendant's brother lived in the house. Lt. Webb also testified that Mr. Mabry told him that the man he saw in the house with Mr. Freeman was named Jerry despite Mr. Mabry testifying at trial that he never spoke to the Defendant.

This evidence corroborated several aspects of Mr. Phelps's testimony, chiefly, that Mr. Mabry saw some of the stolen golf clubs in the Defendant's house and that Mr. Freeman participated in selling the golf clubs. With respect to the Defendant's claims that Lt. Webb's testimony that he lived at the Corker Avenue house was insufficient without supporting "documentary evidence," we note that the Defendant presented no evidence to challenge Lt. Webb's testimony. We are not aware of any requirement that anything more than Lt. Webb's testimony was required to establish the uncontested fact that the Defendant lived in the home. As such, we conclude that Mr. Phelps's testimony was sufficiently corroborated and that the

evidence at trial established that the Defendant exercised control over the stolen golf clubs without the owner's effective consent with the intent to deprive the owner of the property.

## II. Consecutive Sentences

The Defendant contends that the trial court erred in ordering his sentence to be served consecutively to a prior sentence. The Defendant argues that his record of criminal activity was not extensive and that it did not establish that he was a professional criminal. The State responds that the trial court did not abuse its discretion in ordering consecutive sentencing.

Our supreme court has recently clarified that when reviewing a trial court's imposition of consecutive sentences, "the presumption of reasonableness applies" and gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." State v. James Allen Pollard, --- S.W.3d ---, No. M2011-00332-SC-R11-CD, 2013 WL 6732667, at *9 (Tenn. Dec. 20, 2013). "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." Id. (citing State v. Dickson, 413 S.W.3d 735 (Tenn. 2013)).

Here, the trial court concluded that the Defendant was an offender whose record of criminal activity was extensive and that he was a professional criminal who had knowingly devoted his life to criminal acts as a major source of livelihood. See Tenn. Code Ann. § 40-35-115(b)(1), (2). It is clear from the record before us that the Defendant had an extensive record of criminal activity given his four felony convictions between 1987 and 1993, that he absconded from probation repeatedly between 1993 and 2000, and that he was recently convicted of burglary and theft in a related case. Accordingly, we conclude that the trial court did not abuse its discretion in imposing consecutive sentences.[1]

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

---

[1]Because only one of the grounds listed in section 40-35-115(b) is needed to justify consecutive sentencing, we need not determine whether the trial court properly concluded that the Defendant was a professional criminal.